UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF LOUISIANA

LAFAYETTE DIVISION

| | |
|---|---|
| **DONALD BATISTE** | **DOCKET NO.** _____ |
| **VERSUS** | **JUDGE** _____ |
| **QUALITY CONSTRUCTION AND PRODUCTION, LLC, HELMERICH & PAYNE INTERNATIONAL DRILLING COMPANY, AND ARENA ENERGY** | **MAGISTRATE JUDGE** _____ **JURY DEMANDED** |

**COMPLAINT FOR DAMAGES**

**NOW INTO COURT**, through undersigned counsel, comes Petitioner, **DONALD BATISTE**, a person of the full age of majority and a domiciliary of the Parish of Lafayette, State of Louisiana, who respectfully represents to this court the following, to-wit:

1.

This action arises under the Admiralty and General Maritime Law of the United States pursuant to 28 U.S.C. § 1333 and alternatively, the Jones Act, 46 USC § 688, and alternatively, Section 905(b) of the Longshore and Harbor Workers Compensation Act, and alternatively, under the Outer Continental Shelf Act, 43 USC § 1331, and pursuant to 28 USC § 1331 and 1367 on the supplemental jurisdiction of this Court to entertain claims arising under Louisiana State Law.

2.

Made Defendants herein are:

a) **QUALITY CONSTRUCTION AND PRODUCTION, LLC** ("QCP"), upon information and belief, a business corporation authorized to do and doing business, at all times relevant, within the State of Louisiana;

b) **HELMERICH & PAYNE INTERNATIONAL DRILLING COMPANY** ("H&P"), upon information and belief, a business corporation authorized to do and doing business, at all times relevant, within the State of Louisiana; and

c) **ARENA ENERGY** ("Arena"), upon information and belief, a foreign business corporation authorized to do and doing business, at all times relevant, within the State of Louisiana.

3.

This is an action by a seaman without prepayment of costs, pursuant to Section 1916 of the Judicial Code, 28 USC § 1916.  The action is brought under the admiralty law as modified by the Jones Act, 46 USC 688.

4.

Defendants are indebted, jointly, severally, and *in solido*, for the following:

Petitioner was hired by QCP on or about March 21, 2007, to work as a rigger for various offshore operations that QCP would contract with other companies.

5.

On or about October 26, 2013, Petitioner was sent by QCP to a drilling platform near Eugene Island, located in the Gulf of Mexico, to work as a rigger and perform various duties for Arena, who owned said platform at all times relevant, and H&P, who owned the oil rig that was stationed on said platform at all times relevant.  Specifically, Petitioner was required to unhook large material baskets and other equipment that was being transferred by crane from the platform to a vessel.  H&P was responsible for operating the crane during these transfers and Arena, who leased the vessel, was responsible for keeping the vessel steady and keeping a safe environment on the vessel during said transfers.

6.

Arena wanted to load all of the equipment onto a single vessel, despite the fact that Arena had another vessel capable of carrying the equipment that was also leased out and situated near the platform.  Arena loaded numerous large pipes and material baskets onto the vessel, ultimately cluttering the vessel and allowing only four feet of space between each piece of equipment, which was in violation of regulations set forth by the United States Coast Guard.

7.

The weather during the aforesaid transfers was stormy and the seas were rough.  The vessel captain, who had to manually control the vessel, had difficulty keeping the vessel steady during the transfers due to the weather conditions.

8.

Arena wanted to place a piece of equipment in a small space between two other pieces of equipment that were located on the deck of the vessel.  The rigger foreman on duty, an employee of QCP, argued with the Arena inspector and insisted that the equipment would not fit.  The Arena inspector ignored the foreman's pleas and insisted on moving forward with the plan to place the equipment on the vessel deck stating 'he could see with his two eyes' that the basket could be placed on the vessel deck.

9.

When the crane operator, who was employed by H&P, began lowering said piece of equipment, Petitioner and the other workers on the vessel noticed that the equipment was not going to fit in the small space between the other two pieces of equipment.  Petitioner, who was assigned to be the tag line operator, notified the radio operator to give an "all stop" signal to the crane operator intended to stop the crane from maneuvering any further.  The Arena employee

informed the crane operator by radio that an "all stop" signal was given and thus he must stop lowering the crane and the piece of equipment attached to the crane.

10.

Despite attempts to stop the crane operator by radio from lowering the equipment, the crane operator continued to lower said equipment onto the vessel deck.  The equipment did not fit in the small space but instead landed on the end of the large pipe that Petitioner was standing on when he was going to grab the tag line.  The force of the piece of equipment landing on the large pipe flung Petitioner into the air sending him into the side of the said equipment, which was still being held up by the crane.  The large pipe then struck Petitioner in the head, knocking his hard hat off and sending Petitioner crashing to the vessel's deck.  Shortly thereafter, Petitioner regained his composure and ran away to a safe area of the vessel.

11.

Later that same night, a meeting that included Petitioner, other QCP employees, Arena employees, and H&P employees, was held to address the accident that injured Petitioner.  The supervisors labeled the accident a "near miss" and the H&P supervisors attributed the accident as a "miscommunication" between the vessel workers and the crane operator.  During said meeting, no incident report or accident report was created and no paperwork was filled out by any of the aforementioned superiors acknowledging the accident that occurred earlier in the evening.

12.

Petitioner, who was suffering severe neck and back pain as a result of the accident, was flown back to Louisiana on or about October 27, 2013.  Upon arrival, he met with QCP's safety coordinator, Chad Comeaux, to discuss the accident.  Chad Comeaux told Petitioner to go home,

take some aspirin, and referred him to a doctor's office where QCP commonly sends workers for treatment of their injuries.

13.

Petitioner visited said doctor's office the next day, on or about October 28, 2013, where X-rays of his neck and back were taken.  The doctor believed that Petitioner only had arthritis in his neck and told him that he could return to work at QCP the next day.

14.

Petitioner returned to work the next day, on or about October 29, 2013, where he was assigned stationary work at a desk in the office due to his physical injuries.  However, the neck and back pain was so severe that Petitioner was unable to work and was subsequently sent home from work by QCP.  Upon leaving QCP's office, Petitioner presented to University Medical Center for treatment of his neck and back injuries.  University Medical Center took X-rays of his neck and back and informed him that he needed an MRI conducted by the other doctor's office.  Shortly thereafter, Petitioner informed QCP of University Medical Center's findings.  He was told by QCP that an MRI wasn't necessary and to see the doctor he was referred to again.

15.

When Petitioner presented to said doctor's office again on or about November 4, 2013, for a follow-up visit, he informed the doctor about the possible need for an MRI based on University Medical Center's findings.  Petitioner was told that the doctor's office needed all of his medical records from University Medical Center before they could move forward and to return the following week after they received the records.  When Petitioner returned to the doctor's office on November 11, 2013, he was told that they have not received the medical records and to return a week later when they expect to have them.

16.

On or about November 16, 2013, before Petitioner could return to said doctor's office, QCP's lawyer contacted Petitioner by telephone and told him to continue seeing their doctors so they could figure out his compensation for the accident in addition to compensation for lost work wages over the past few weeks.  Petitioner was ultimately sent one check totaling approximately $881.00 from QCP that was intended to compensate him for lost work wages over a two-week period.

17.

Petitioner was never contacted to work again by QCP and was sent a "Separation Notice" on or about March 31, 2014, which terminated their employment relationship.  The reason for termination was because Petitioner was physically unable to work.

18.

Cornell Francis, a rigger for QCP and one of the workers that witnessed the accident on October 26, 2013, asked Peter Broussard, a QCP offshore coordinator and superior of both Mr. Francis and Petitioner, about Petitioner and why he wasn't employed by QCP anymore.  Mr. Broussard told Mr. Francis and three other workers, including Dwayne Alexander, who also witnessed the aforementioned accident, that if Petitioner "would've kept his mouth shut and just taken workers' compensation, he still would've had a job [with QCP]."

19.

Based on the above facts, the negligence of the defendants were a cause-in-fact of the accident described herein and the resultant injuries to Petitioner in the following, non-exclusive particulars:

   a) Failing to provide Petitioner with a safe place to work;

b) Failing to discover the hazardous condition aboard the vessel;

c) Creating the hazardous condition by stacking the equipment too close together;

d) Failing to discover work being performed in a hazardous manner or under hazardous circumstances;

e) Failing to warn Petitioner of the hazardous conditions aboard the vessel;

f) Allowing an unsafe condition to exist aboard the vessel;

g) Failing to listen to the warnings of Petitioner that would have prevented the accident; and

h) Failing to provide a seaworthy vessel.

20.

The acts and/or omissions of negligence of the defendants were a legal and proximate cause of the injuries sustained by Petitioner, Donald Batiste, both as to the breaches of duty owed to the Petitioner under the Jones Act and the General Maritime Laws of the United States.

21.

In addition to the acts and/or omissions of negligence complained of herein above, Petitioner asserts that the unseaworthy conditions of the vessel caused and contributed to his accident and related injuries.

22.

Further, Petitioner contends that nothing he did or failed to do caused or contributed to his accident and related injuries.

23.

As a result of the accident, Petitioner was injured, included but not limited to injuries to his neck and back, for which he is due damages as follows:

a) Pain and suffering; past, present, and future, in an amount reasonable in the premises;

b) Mental anguish and anxiety; past, present, and future, in an amount reasonable in the premises;

c) Medical bills and expenses; past, present, and future, in an amount reasonable in the premises;

d) Residual physical and mental impairment; past, present, and future, in an amount reasonable in the premises;

e) Disability and/or disfigurement; past, present, and future, in an amount reasonable in the premises;

f) Impairment of earning capacity;

g) Loss of future earning capacity;

h) Lost work wages; and

i) Loss of enjoyment of life and other hedonic damages; past, present, and future, in an amount reasonable in the premises.

**WHEREFORE**, Petitioner, Donald Batiste, prays that this petition be filed and that defendants, Quality Production and Construction, LLC, Helmerich & Payne International Drilling Company, and Arena Energy, be duly cited and served with a copy of same and, that after legal delays and due proceedings had there be judgment in favor of plaintiff and against defendants for a full and true sum of an amount reasonable in the premises to be proven at the trial on the merits of this matter, together with legal interest from date of judicial demand until paid, and for all costs of these proceedings and all other just and equitable relief.

Respectfully submitted:

s/L. Clayton Burgess
L. CLAYTON BURGESS (22979)
Attorney for plaintiff
L. Clayton Burgess, A P.L.C.
605 West Congress Street
Lafayette, Louisiana 70501

Telephone: (337) 234-7573
Facsimile: (337) 233-3890
E-mail: lcburgess@clayburgess.com
Counsel for the Complainant


s/Robert K. Guillory
ROBERT K. GUILLORY (6580)
605 West Congress Street
Lafayette, Louisiana 70501
Telephone: (337) 234-0500
Facsimile: (337) 376-2992
E-mail: robertkguillory@att.net
Counsel for the Complainant