UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF LOUISIANA
LAFAYETTE DIVISION

| | |
|---|---|
| DONALD BATISTE | CIVIL ACTION NO. 6:14-cv-03045 |
| VERSUS | MAGISTRATE JUDGE HANNA |
| QUALITY CONSTRUCTION & PRODUCTION LLC, ET AL. | BY CONSENT OF THE PARTIES |

## MEMORANDUM RULING

Pending before this Court is the motion for summary judgment that was filed by defendant RCI Consultants, Inc. (Rec. Doc. 98). The motion is unopposed. Considering the evidence, the law, and the arguments of the parties, and for the reasons fully explained below, the motion is GRANTED, and the plaintiff's claim against RCI is DISMISSED WITH PREJUDICE.

## Background

On October 26, 2013, the plaintiff, Donald Batiste, was employed by Quality Construction and Production, LLC as a rigger. At that time, he and the other members of his crew were working on a construction project on an offshore platform in the Gulf of Mexico that was owned and operated by Arena Energy. The crew was supervised by Quality Construction employee David Franks. Arena had also contracted with RCI Consultants, Inc. to provide an individual to oversee the

construction work that Quality Construction was doing. At all relevant times, RCI's employee Mitch Migues filled that role.

The plaintiff claims that he was injured on October 26, 2013 while standing on the deck of a vessel engaged in the task of backloading the vessel from the platform. He contends that he gave an "all stop" signal that was ignored by the crane operator and that the crane operator proceeded to set a material basket down on a pipe that was laying on the vessel's deck. In his complaint, the plaintiff alleged that he was injured when the basket's contact with the pipe caused him to be flung into the side of the basket and also caused the pipe to rise up into the air and strike him in the head.

In his original complaint, the plaintiff asserted negligence claims against three defendants – his employer, Quality Construction and Production, LLC; the drilling company, Helmerich & Payne International Drilling Company; and the owner and operator of the platform, Arena Energy. (Rec. Doc. 1). The plaintiff's claim against Quality Construction was voluntarily dismissed. In his first supplemental and amending complaint, the plaintiff added negligence claims against WDS Global Partners, LLC, which employed simultaneous operations coordinator Gordon Sand; RCI Consultants, Inc., which employed construction inspector Mitch Migues; and Kilgore Offshore, Inc., which was then believed to operate the vessel on which the accident occurred. (Rec. Doc. 44). In his second supplemental and amending

complaint (Rec. Doc. 60), the plaintiff substituted Alliance Offshore, L.L.C. for Kilgore Marine and alleged that Alliance was the operator of the vessel on which the accident allegedly occurred.

In support of the instant motion, RCI argued that, under RCI's contract with Arena, RCI employee Mitch Migues's job was to oversee the construction work that was being performed by Quality Construction and to ensure that the work was completed in conformity with Arena's specifications but not to control the way that Quality Construction's employees performed individual tasks. RCI further argued that the plaintiff's claims against it should be dismissed because RCI's employee Mr. Migues had no responsibility for the manner in which the backloading operation was performed, owed no duty to the plaintiff, breached no duty that he might have owed to the plaintiff, and played no role in causing the plaintiff's alleged accident and resulting injuries.

## Analysis

### A. The Summary Judgment Standard

Under Rule 56(a) of the Federal Rules of Civil Procedure, summary judgment is appropriate when there is no genuine dispute as to any material fact, and the moving party is entitled to judgment as a matter of law. A fact is material if proof of its existence or nonexistence might affect the outcome of the lawsuit under the

applicable governing law.[1] A genuine issue of material fact exists if a reasonable jury could render a verdict for the nonmoving party.[2]

The party seeking summary judgment has the initial responsibility of informing the court of the basis for its motion and identifying those parts of the record that demonstrate the absence of genuine issues of material fact.[3] If the moving party carries its initial burden, the burden shifts to the nonmoving party to demonstrate the existence of a genuine issue of a material fact.[4] All facts and inferences are construed in the light most favorable to the nonmoving party.[5]

If the dispositive issue is one on which the nonmoving party will bear the burden of proof at trial, the moving party may satisfy its burden by pointing out that there is insufficient proof concerning an essential element of the nonmoving party's

---

[1] *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Sossamon v. Lone Star State of Tex.*, 560 F.3d 316, 326 (5th Cir. 2009); *Hamilton v. Segue Software, Inc.*, 232 F.3d 473, 477 (5th Cir. 2000).

[2] *Brumfield v. Hollins*, 551 F.3d 322, 326 (5th Cir. 2008) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. at 252); *Hamilton v. Segue Software, Inc.*, 232 F.3d at 477.

[3] *Washburn v. Harvey*, 504 F.3d 505, 508 (5th Cir. 2007) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)).

[4] *Washburn v. Harvey*, 504 F.3d at 508.

[5] *Brumfield v. Hollins*, 551 F.3d at 326 (citing *Matsushita Elec. Indus. Co. v. Zenith Radio*, 475 U.S. 574, 587 (1986)).

claim.[6] The motion should be granted if the nonmoving party cannot produce evidence to support an essential element of its claim.[7]

**B.**     **The Applicable Law**

In his complaint, the plaintiff alleged that the accident occurred near Eugene Island in the Gulf of Mexico. The complaint does not expressly state whether Arena's platform is located in state waters or in federal waters and no further factual detail was provided. Consistent with this lack of detail, the plaintiff alleged that his claims are either governed by the general maritime law or, alternatively, by Louisiana state law pursuant to the Outer Continental Shelf Lands Act. In support of its motion, RCI argued that the plaintiff failed to establish a valid negligence claim under either the general maritime law or under Louisiana law.

To state a claim for negligence under the general maritime law, a plaintiff must demonstrate that the defendant owed a duty to the plaintiff, the defendant breached the duty, the plaintiff sustained an injury, and there is a causal connection between the defendant's conduct and the plaintiff's injury.[8] "Under maritime law, a plaintiff

---

[6] *Norwegian Bulk Transport A/S v. International Marine Terminals Partnership*, 520 F.3d 409, 412 (5th Cir. 2008) (citing *Celotex Corp. v. Catrett*, 477 U.S. at 325).

[7] *Condrey v. Suntrust Bank of Ga.*, 431 F.3d 191, 197 (5th Cir. 2005).

[8] *Thomas v. Chevron U.S.A., Inc.*, 832 F.3d 586, 592 (5th Cir. 2016); *Canal Barge Co. v. Torco Oil Co.*, 220 F.3d 370, 376 (5th Cir. 2000); *In re Cooper/T. Smith*, 929 F.2d 1073, 1077 (5th Cir. 1991).

is owed a duty of ordinary care under the circumstances."[9] Whether a duty is owed is a legal question; whether the defendant breached a duty is a question of fact.[10] Under the general maritime law, a party's negligence is actionable only if it is a legal cause of the plaintiff's injuries.[11] To be the legal cause of the plaintiff's injuries, the defendant's negligence must be a substantial factor in causing the injuries.[12]

The elements of a negligence claim under Louisiana state law are virtually identical. To establish a negligence claim under Louisiana law, a plaintiff must prove that the defendant had a duty to conform his conduct to a specific standard, the defendant breached that duty, the defendant's substandard conduct was a cause-in-fact of the plaintiff's injures, the defendant's substandard conduct was a legal cause of the plaintiff's injuries, and the plaintiff sustained damages.[13] Under Louisiana law, whether the defendant owed a duty to the plaintiff is a question of law but whether the defendant breached a duty is a question of fact.[14]

---

[9] *In re Great Lakes Dredge & Dock Co. LLC*, 624 F.3d 201, 211 (5th Cir. 2010).

[10] *Canal Barge Co., Inc. v. Torco Oil Co.*, 220 F.3d at 376.

[11] *In re Great Lakes Dredge & Dock Co. LLC*, 624 F.3d 201, 214 (5th Cir. 2010); *Donaghey v. Ocean Drilling & Exploration Co.*, 974 F.2d 646, 649 (5th Cir. 1992).

[12] *In re Great Lakes Dredge & Dock Co. LLC*, 624 F.3d at 214.

[13] *Hanks v. Entergy Corp.*, 2006-477 (La. 12/18/06), 944 So.2d 564, 579.

[14] *Broussard v. State ex rel. Office of State Bldgs.*, 2012-1238 (La. 04/05/13), 113 So.3d 175, 185.

Because the elements are so similar, this Court will not decide at this time whether general maritime law or Louisiana law applies to the plaintiff's claims. However, this is an issue that will have to be resolved as the litigation progresses.

**B.     Did RCI's Breach of a Duty Owed to the Plaintiff Cause the Incident?**

In support of its motion, RCI argued that it did not breach any duty it might have owed to the plaintiff and, consequently, cannot be held liable for the alleged accident or for the plaintiff's alleged injury. Although no contract between RCI and Arena was submitted in support of RCI's motion, Mr. Migues testified at his deposition that RCI was hired by Arena and that his role was to oversee the work being done by the construction company working on the platform to make sure that the work is done to Arena's satisfaction and in compliance with Arena's specifications. (Rec. Doc. 98-3 at 3-4). Without having had an opportunity to review any contract between Arena and RCI that might have been in effect at the time of the plaintiff's alleged accident, this Court assumes that RCI was Arena's independent contractor.

This Court similarly assumes that Quality Construction was Arena's independent contractor. The evidence submitted by RCI established that the plaintiff was employed by Quality Construction. (Rec. Doc. 98-4 at 2; Rec. Doc. 98-6 at 4). Although no contract between Quality Construction and Arena was submitted in

support of RCI's motion, no evidence was presented establishing that any other sort of relationship existed between Quality Construction and Arena.

Under Louisiana law, an independent contractor such as RCI owes a duty of reasonable care to the employees of the other independent contractors on the job when they do not employ, share a contract with, pay, or actually supervise those persons.[15] Accordingly, at a minimum, RCI and its employee Mr. Migues owed a duty of reasonable care to the plaintiff at all relevant times. Whether that duty was breached by the actions or omissions of Mr. Migues and whether any such breach of duty contributed to the cause of the plaintiff's accident are the issues that must be resolved in order to decide this motion.

The following facts are set forth in the deposition excerpts submitted by RCI in support of its motion, and they were not disputed by the plaintiff. Both drilling operations and construction operations were taking place on Arena's platform at the time of the plaintiff's alleged accident. H&P was the drilling contractor, and it was an H&P employee who operated the crane at all material times. Quality Construction contracted with Arena to provide labor and equipment for the installation of piping on the platform. Arena contracted with RCI to provide a person to ensure that

---

[15] *McCarroll v. Seatrax Services, Inc.*, No. 12-2402, 2013 WL 3872219, at *4 (E.D. La. July 24, 2013).

Quality Construction's work met Arena's specifications. The RCI employee on the platform at relevant times was Mitch Migues. Because simultaneous operations were ongoing, Arena also contracted with WDS to provide a simultaneous operations (or "simops") coordinator to oversee the coordination of operations between the various contractors. WDS employee Gordon Sand was the simops coordinator on the platform at all material times.

At the time of the alleged incident, Quality Construction's crew included superintendent, David Franks, at least two riggers – the plaintiff Donald Batiste and Michael Comeaux – as well as several fitters and welders. That morning, Mr. Franks held a safety meeting with his crew, and Mr. Migues attended the safety meeting. After the morning safety meeting, the plaintiff went to work with Quality Construction's fitters.

At some point later in the day, someone requested that material baskets be moved from the platform to the M/V NICHOLAS C. It is not clear from the various individuals' deposition testimony precisely who originally made that request – either an H&P employee or Mr. Sand. However, it is undisputed that Mr. Sand requested that Quality Construction's riggers assist in the transfer of baskets from the platform to the vessel.

According to his deposition testimony, Mr. Batiste was an experienced rigger who had worked for Quality Construction for more than nine years and had approximately eighteen years of total experience in that job before the date in question. (Rec. Doc. 98-6 at 4). Although he was working as a rigger on this particular job, he was sometimes designated as a rigger foreman. (Rec. Doc. 98-6 at 4). He knew how to do his job, and he took instruction on what tasks he was to perform from his supervisor, Mr. Franks. (Rec. Doc. 98-6 at 21).

The plaintiff testified at his deposition that, on the day of the alleged accident, fellow rigger Michael Comeaux came to him and told him that he was needed to go with Mr. Comeaux to meet with Mr. Franks about work to be done on the boat. (Rec. Doc. 98-6 at 7). He stated that he then met with Mr. Franks and Mr. Comeaux near the handrail of the platform's cellar deck, and that Mr. Franks told them to confer with the crane operator regarding what needed to be done. (Rec. Doc. 98-6 at 8, 9, 16). He and Mr. Comeaux then met with the crane operator, discussed what material would be transferred from the platform to the vessel, discussed who would transmit signals from the vessel to the platform, and made sure that the riggers had radio communication with the crane operator. (Rec. Doc. 98-6 at 8, 17). Mr. Comeaux was in charge of the radio, which was going to be used for communicating with the crane operator about positioning the baskets on the vessel's deck. (Rec. Doc. 98-6 at 8, 10,

18). Mr. Batiste and Mr. Comeaux were then transferred to the deck of the vessel by personnel basket. (Rec. Doc. 98-6 at 9). Before the backloading operation began, however, the crane operators were changed out, and the person that the plaintiff and Mr. Comeaux had already consulted with was not the person who operated the crane during the backloading procedure. (Rec. Doc. 98-6 at 13).

Mr. Batiste testified that, as the crane was lowering the first material basket from the platform to the deck of the vessel, he realized that the basket was going to be placed on top of a pipe that was laying on the deck. (Rec. Doc. 98-6 at 10). When the basket was about eight to ten feet above the vessel's deck, he called for an "all stop" by hand signal to Mr. Comeaux. (Rec. Doc. 98-6 at 10, 19). He stated that the crane operator, the boat captain, and anyone else in the area should have been able to see his hand signal. (Rec. Doc. 98-6 at 10, 19). He could see the crane operator and he thought that the crane operator could see him. (Rec. Doc. 98-6 at 19). Mr. Batiste claims, however, that the crane operator did not stop lowering the basket, which came down on the pipe, throwing Mr. Batiste into the basket and causing him to fall to the deck. (Rec. Doc. 98-6 at 10). More particularly, Mr. Batiste testified that, because he thought the crane operator had seen the "all stop" signal and was going to stop lowering the basket, he stepped forward toward the spot where the basket was being set down, but the crane operator did not stop lowering the basket,

and the basket struck the pipe, which "catapults me into the load itself." (Rec. Doc. 98-6 at 19).

Mr. Comeaux's testimony regarding the incident is generally consistent with Mr. Batiste's testimony. He understood that three material baskets were to be backloaded from the platform to the vessel, and the incident occurred while the first basket was being lowered. (Rec. Doc. 98-7 at 6). Mr. Comeaux explained that the final decision on how the baskets would be positioned on the vessel's deck was left to the riggers. (Rec. Doc. 98-7 at 6). Mr. Comeaux's testimony differed from Mr. Batiste's in that Mr. Comeaux thought Mr. Sand was present for the JSA at the handrail. (Rec. Doc. 98-7 at 3). He additionally stated that Mr. Franks told him that it was Mr. Sand who had requested that the riggers help with backloading the boat. (Rec. Doc. 98-7 at 2). He also stated that Mr. Franks explained the procedure for the operation and presented he and Mr. Batiste with a JSA [job safety analysis] that they signed before going over to the boat. (Rec. Doc. 98-6 at 2, 7).

Like Mr. Batiste, Mr. Comeaux testified that the crane operator that he and Mr. Batiste conferred with before being transferred to the vessel was not the crane operator who actually moved the material basket from the platform to the vessel. (Rec. Doc. 98-7 at 3, 6). Before the operation began, however, Mr. Comeaux confirmed with the new crane operator that they had radio communication. (Rec.

Doc. 98-7 at 8). Before the crane operator started lowering the basket, Mr. Comeaux observed pipes lying on the deck between some of the material baskets but he did not think that would affect the placement of the baskets that were being backloaded. (Rec. Doc. 98-7 at 6, 8). However, as the basket was being lowered, he heard Mr. Batiste call out an oral "all stop" command, and Mr. Comeaux radioed an "all stop" instruction to the crane operator; then Mr. Comeaux also saw Mr. Batiste giving the "all stop" hand signal. (Rec. Doc. 98-7 at 4, 6). But the crane operator did not stop lowering the basket. (Rec. Doc. 98-7 at 4). Mr. Comeaux testified that the basket came down on a pipe on the vessel's deck, which hit Mr. Batiste, causing his hard hat to fly off. (Rec. Doc. 98-7 at 4, 5). Mr. Comeaux believed that the crane operator had a clear line of sight to both he and Mr. Batiste, and he told the crane operator to "all stop" over the radio three or four times, but the crane operator did not stop. (Rec. Doc. 98-7 at 4, 5).

Benny Withers, an H&P employee, was the person operating the crane at the time of the incident. (Rec. Doc. 98-8 at 2). He testified that he had a meeting at the pipe rack with someone who might have been Mr. Sand concerning how baskets on the vessel were to be repositioned so that baskets from the platform could be backloaded onto the vessel, and that he then communicated that same information via radio to men on the deck of the vessel. (Rec. Doc. 98-8 at 4, 10, 14-15). He testified

that he maintained a line of sight on Mr. Batiste during the operation (Rec. Doc. 98-8 at 5-6) but never saw an "all stop" signal (Rec. Doc. 98-8 at 8). He also stated that he never received a radio message telling him to stop. (Rec. Doc. 98-8 at 8-9). Additionally, he testified that, other than the person he conferred with at the pipe rack, nobody else gave him any instructions on how to perform this job. (Rec. Doc. 98-8 at 14).

At his deposition, Mr. Franks stated that he was the supervisor over approximately sixteen people on Quality Constructions' crew and that he gave them their day-to-day work assignments. (Rec. Doc. 98-4 at 2). He testified that Mr. Migues was the "company man" over the construction operations on the platform and that Mr. Sand was the simops coordinator between the construction work and the drilling work that was taking place on the platform. (Rec. Doc. 98-4 at 2-3). He further explained that, while Mr. Migues could make suggestions about how the Quality Construction crew might do its work, he did not have the power to instruct the crew on how to do its work. (Rec. Doc. 98-4 at 15). Mr. Franks testified that, on the day of the accident, Mr. Sand asked him to provide riggers so that equipment could be backloaded onto the vessel. (Rec. Doc. 98-4 at 5). He testified that H&P personnel always operated the crane, that numerous transfers between the platform and vessels occurred every day, and that it was typical for Quality Construction's

personnel to meet with the crane operator and discuss a task before it was undertaken. (Rec. Doc. 98-4 at 3-4). Mr. Franks recalled that such a meeting including himself, Mr. Comeaux, Mr. Batiste, and the crane operator took place before the incident in question. (Rec. Doc. 98-4 at 4, 8). Mr. Franks testified that, on this occasion, he, Mr. Comeaux, Mr. Batiste, and the day shift crane operator stood at the rail, looked down at the boat, and discussed what was going to be done. (Rec. Doc. 98-4 at 8). After the meeting, he went into his office, prepared a JSA, then came back out and rejoined Mr. Batiste and Mr. Comeaux. (Rec. Doc. 98-4 at 4, 9). He recalled that, at that point, Mr. Sand was talking with the crane operator at the handrail. (Rec. Doc. 98-4 at 9). Mr. Franks then had a further meeting with the crane operator, Mr. Batiste, and Mr. Comeaux. (Rec. Doc. 98-4 at 9). During these meetings, Mr. Franks identified what had to be moved to make room for the baskets that were being backloaded but he stated that how the objects were moved was up to the crane operator and the riggers once they were on the boat. (Rec. Doc. 98-4 at 9). After the meetings, Mr. Franks went back to his office, and he did not witness the incident. Instead, an unidentified safety man came into the office, advised he and Mr. Migues that an incident had occurred, and he and Mr. Migues then met Mr. Sand coming into the office as they were leaving the office. (Rec. Doc. 98-4 at 4).

Mr. Franks testified that he did not involve Mr. Migues in the backloading operation, which was a usual occurrence. (Rec. Doc. 98-4 at 7). He stated that Mr. Migues's job was to oversee Quality Construction's work, to see that the work stayed on time, and to assure that the work was done in compliance with Arena's requirements. (Rec. Doc. 98-4 at 7). Mr. Franks stated that there was no reason to involve Mr. Migues in the meeting that he conducted before the backloading procedure started because it was "a normal everyday thing that we normally do." (Rec. Doc. 98-4 at 8, 15). However, Mr. Migues would typically sign off on the JSAs that Mr. Franks prepared. (Rec. Doc. 98-4 at 2, 7). In this case, Mr. Franks's recollection was that, after Mr. Sand asked him to provide the riggers to assist with moving the baskets, he went to the rail, wrote up a JSA, met with Mr. Comeaux and Mr. Batiste while Mr. Sand was conferring with the crane operator, then Mr. Comeaux and Mr. Batiste went upstairs to the crane, and Mr. Franks went back into the office. (Rec. Doc. 98-4 at 8-9).

Mr. Sand testified at his deposition that he was employed by WDS and working as Arena's simops coordinator on the platform at the time of the alleged incident, coordinating drilling and construction operations. (Rec. Doc. 98-5 at 3). Mr. Sand's recollection was that the construction crew contacted him to coordinate the use of the crane to transfer empty containers from the platform to the vessel and bring full

containers from the vessel to the platform. (Rec. Doc. 98-3 at 4). He testified that he and someone from the construction company – perhaps Mr. Migues – looked at the baskets that needed to be moved to the boat and discussed how they could be arranged on the boat. (Rec. Doc. 98-5 at 6). He did not know how that person would have communicated what they discussed to anyone else, and he stated that he had no further involvement in the layout of the baskets or how they were to be placed on the vessel. (Rec. Doc. 98-5 at 6). Mr. Sand further testified that, at shift change that evening, he met with the crane operator who was going on tower, stood at the handrail, and discussed what he thought was going to happen. (Rec. Doc. 98-5 at 7). He pointed out the baskets that he thought were going to be moved. (Rec. Doc. 98-5 at 12). Mr. Sand knew that the pipe was laying on the vessel's deck, stated that was the only place that the pipe could fit on the deck, and further stated that he did not think a material basket would be placed near the pipe during the backloading operation. (Rec. Doc. 98-5 at 11). But he did not know what instructions were given to the riggers with regard to positioning the baskets on the vessel's deck. (Rec. Doc. 98-5 at 12-13, 15). At the time of the accident, Mr. Sand was standing on the deck, alone, looking over the handrail down at the boat. (Rec. Doc. 98-5 at 5-6).

Mr. Migues confirmed that his role was to oversee the work being done by the construction company and to make sure it was done to Arena's satisfaction and in

compliance with Arena's specifications. (Rec. Doc. 98-3 at 3-4). He said that his position is sometimes referred to as "company man" but more accurately is "inspector." (Rec. Doc. 98-3 at 3, 10). According to Mr. Migues, Mr. Sand's role as simops coordinator included obtaining the use of the crane by the construction crew when necessary. (Rec. Doc. 98-3 at 4). His recollection was that, on the day of the incident, an H&P employee went to Mr. Sand and advised that some baskets needed to be moved from the platform to the boat, and Mr. Sand then went to Mr. Franks and asked him to provide riggers on the boat to assist with that operation. (Rec. Doc. 98-3 at 5). Mr. Migues confirmed that Mr. Franks did not need to get his input on the particulars of how the basket transfer was to be done. (Rec. Doc. 98-3 at 7). He described such transfers as "routine stuff." (Rec. Doc. 98-3 at 7). Mr. Migues did not see the incident happen, and he learned about it after it occurred. (Rec. Doc. 98-3 at 7). In fact, his testimony was that nobody – particularly not Mr. Franks and not Mr. Sand – communicated with him about the repositioning of the material basket until after it had already taken place. (Rec. Doc. 98-3 at 10, 11).

There is no evidence that Mr. Migues gave Mr. Batiste, Mr. Comeaux, or Mr. Withers any instructions on where to position the material baskets backloaded from the platform onto the deck of the vessel or how they were to go about performing that task. There is no evidence that Mr. Migues gave Mr. Batiste, Mr. Comeaux, or Mr.

Withers any instructions on how they were to communicate with each other, signal each other, or otherwise perform the task of backloading the baskets. Even if Mr. Migues did discuss with Mr. Sand which baskets were to be moved off the platform and where they were to then be placed on the vessel – as Mr. Sand contended but as was disputed by Mr. Migues's testimony – it is undisputed that the riggers had the final say with regard to where and how the baskets were to be positioned on the vessel's deck. Mr. Migues's role was to be the liaison between Arena and Quality Construction and to oversee in a general sense the work that Quality Construction's employees were performing. He and Mr. Franks testified consistently that Mr. Migues did not have the authority to instruct Quality Construction's employees with regard to the way they should perform individual tasks that had to be undertaken, particularly ordinary, routine tasks such as backloading baskets from the platform to the vessel. Instead, Mr. Migues's role was to make sure that the piping work being performed by Quality Construction complied with Arena's specifications and standards. His role did not encompass instructing any of the seventeen Quality Construction hands on the platform on how to perform any of the individual tasks that they undertook during the construction project.

Therefore, RCI successfully established that there is no genuine issue of material fact concerning whether Mr. Migues or RCI breached any duty it may have

owed to the plaintiff; consequently, RCI is entitled to judgment in its favor as a matter of law. Similarly, RCI successfully established that there is no genuine issue of material fact concerning whether any action or omission on Mr. Migues's part caused the alleged incident or the plaintiff's allegedly resulting injuries. For that additional reason, RCI is entitled to judgment in its favor as a matter of law.

### **Conclusion**

For the foregoing reasons, and finding no genuine issue of material fact to be resolved, this Court finds that there is no evidence that defendant RCI Consultants, Inc. is liable for the plaintiff's alleged accident and resulting injuries. Accordingly, RCI's motion for summary judgment (Rec. Doc. 98) is GRANTED, and the plaintiff's claim against RCI is DISMISSED WITH PREJUDICE.

Signed at Lafayette, Louisiana on this 28th day of February 2018.

_____
PATRICK J. HANNA
UNITED STATES MAGISTRATE JUDGE