UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF LOUISIANA
LAFAYETTE DIVISION

| | |
|---|---|
| DONALD BATISTE | CIVIL ACTION NO. 6:14-cv-03045 |
| VERSUS | MAGISTRATE JUDGE HANNA |
| QUALITY CONSTRUCTION & PRODUCTION LLC, ET AL. | BY CONSENT OF THE PARTIES |

## MEMORANDUM RULING

Pending before this Court is the motion for summary judgment that was filed by defendant WDS Global Partners, LLC. (Rec. Doc. 100). No opposition memorandum was filed within the time allowed; accordingly, the motion is unopposed. Considering the evidence, the law, and the arguments of the parties, and for the reasons fully explained below, the motion is GRANTED, and the plaintiff's claim against WDS is DISMISSED WITH PREJUDICE.

## Background

On October 26, 2013, the plaintiff, Donald Batiste, was employed by Quality Construction and Production, LLC as a rigger. At that time, he and his crew were working on a construction project on an offshore platform in the Gulf of Mexico that was owned and operated by Arena Energy, LP. The crew was supervised by Quality Construction employee David Franks. Arena had also contracted with RCI Consultants, Inc. to provide an individual to oversee the construction work that

Quality Construction was doing, and Mitch Migues filled that role. Arena also contracted with WDS to provide an individual to coordinate the simultaneous construction, production, and drilling operations ("simops") that took place on the platform. Gordon Sand was the WDS employee filling that role.

The plaintiff claims that he was injured on October 26, 2013 while standing on the deck of a vessel engaged in backloading the vessel from the platform. He contends that he gave an "all stop" signal that was ignored by the crane operator and that the crane operator set a material basket down on a pipe that was laying on the vessel's deck. In his complaint, the plaintiff alleged that he was injured when the basket's contact with the pipe caused him to be flung into the side of the basket and also caused the pipe to rise up into the air and strike him in the head.

The plaintiff currently has negligence claims against Arena, the owner of the platform; Helmerich & Payne International Drilling Company ("H&P"), the drilling contractor; WDS Global Partners, LLC, which employed the simops coordinator Gordon Sand; and Alliance Offshore, L.L.C., the operator of the vessel on which the accident allegedly occurred.

WDS alleged that its contract with Arena required that Gordon Sand's job was to coordinate the simultaneous operations being conducted by various contractors on the platform. WDS argued that the plaintiff's claim against it should be dismissed

because Mr. Sand had no supervisory authority over anyone on the platform, did not give any of the contractors any particular instructions on how to do their jobs, and had no safety or compliance duties. Although not stated in so many words, the Court infers WDS is arguing that summary judgment should be granted in its favor because no actions or omissions on the part of Mr. Sand caused or contributed to the cause of the plaintiff's accident.

## Analysis

### A. The Summary Judgment Standard

Under Rule 56(a) of the Federal Rules of Civil Procedure, summary judgment is appropriate when there is no genuine dispute as to any material fact, and the moving party is entitled to judgment as a matter of law. A fact is material if proof of its existence or nonexistence might affect the outcome of the lawsuit under the applicable governing law.[1] A genuine issue of material fact exists if a reasonable jury could render a verdict for the nonmoving party.[2]

The party seeking summary judgment has the initial responsibility of informing the court of the basis for its motion and identifying those parts of the record that

---

[1] *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Sossamon v. Lone Star State of Tex.*, 560 F.3d 316, 326 (5th Cir. 2009); *Hamilton v. Segue Software, Inc.*, 232 F.3d 473, 477 (5th Cir. 2000).

[2] *Brumfield v. Hollins*, 551 F.3d 322, 326 (5th Cir. 2008) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. at 252); *Hamilton v. Segue Software, Inc.*, 232 F.3d at 477.

demonstrate the absence of genuine issues of material fact.[3] If the moving party carries its initial burden, the burden shifts to the nonmoving party to demonstrate the existence of a genuine issue of a material fact.[4] All facts and inferences are construed in the light most favorable to the nonmoving party.[5]

If the dispositive issue is one on which the nonmoving party will bear the burden of proof at trial, the moving party may satisfy its burden by pointing out that there is insufficient proof concerning an essential element of the nonmoving party's claim.[6] The motion should be granted if the nonmoving party cannot produce evidence to support an essential element of its claim.[7]

**B.    The Applicable Law**

The plaintiff alleged in his complaint that the accident occurred near Eugene Island in the Gulf of Mexico. The complaint does not expressly state whether Arena's platform is located in state waters or in federal waters and no further factual

---

[3]    *Washburn v. Harvey*, 504 F.3d 505, 508 (5th Cir. 2007) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)).

[4]    *Washburn v. Harvey*, 504 F.3d at 508.

[5]    *Brumfield v. Hollins*, 551 F.3d at 326 (citing *Matsushita Elec. Indus. Co. v. Zenith Radio*, 475 U.S. 574, 587 (1986)).

[6]    *Norwegian Bulk Transport A/S v. International Marine Terminals Partnership*, 520 F.3d 409, 412 (5th Cir. 2008) (citing *Celotex Corp. v. Catrett*, 477 U.S. at 325).

[7]    *Condrey v. Suntrust Bank of Ga.*, 431 F.3d 191, 197 (5th Cir. 2005).

detail was provided. Consistent with this lack of detail, the plaintiff alleged that his claims are either governed by the general maritime law or, alternatively, by Louisiana state law pursuant to the Outer Continental Shelf Lands Act. In its briefing, WDS did not address whether the plaintiff's claims arise under the general maritime law or under Louisiana law or the elements of negligence claims under Louisiana state law or under the general maritime law. However, because the OCSLA would adopt Louisiana state law as surrogate federal law, whether the platform is in state or fedral waters is not a fact the Court must determine at this time. Further, Mr. Sand's connection to the platform and his alleged role in the alleged accident would not trigger the application of general maritime law to the claim against him, therefore, the Court will apply Louisiana substantive law.

To establish a negligence claim under Louisiana law, a plaintiff must prove that the defendant had a duty to conform his conduct to a specific standard, the defendant breached that duty, the defendant's substandard conduct was a cause-in-fact of the plaintiff's injures, the defendant's substandard conduct was a legal cause of the plaintiff's injuries, and the plaintiff sustained damages.[8] Under Louisiana law,

---

[8] *Hanks v. Entergy Corp.*, 2006-477 (La. 12/18/06), 944 So.2d 564, 579.

whether the defendant owed a duty to the plaintiff is a question of law but whether the defendant breached a duty is a question of fact.[9]

**B.      Did WDS's Breach of a Duty Owed to the Plaintiff Cause the Incident?**

WDS did not address the elements of the plaintiff's claim, but it seems to be arguing that it should be found free from liability because it did not cause the alleged accident or the plaintiff's alleged injuries. In support of that argument, WDS submitted some documentary evidence and also adopted the evidence that RCI submitted in support of its own motion for summary judgment.

Although no contract between WDS and Arena was submitted in support of WDS's motion, WDS claimed that it was hired by Arena for the purpose of providing an individual to coordinate the simultaneous operations being conducted on the platform. Without having had an opportunity to review any contract between Arena and WDS that might have been in effect at the time of the plaintiff's alleged accident, this Court assumes that WDS was Arena's independent contractor.

The evidence submitted by RCI in support of its own motion for summary judgment and adopted by WDS established that the plaintiff was employed by Quality Construction. (Rec. Doc. 98-4 at 2; Rec. Doc. 98-6 at 4). Although no contract

---

[9]     *Broussard v. State ex rel. Office of State Bldgs.*, 2012-1238 (La. 04/05/13), 113 So.3d 175, 185.

between Quality Construction and Arena was submitted in support of RCI's motion, no evidence was presented establishing that any other sort of relationship existed between Quality Construction and Arena. Therefore, this Court assumes that Quality Construction was also Arena's independent contractor.

Under Louisiana law, an independent contractor such as WDS owes a duty of reasonable care to the employees of the other independent contractors on the job when they do not employ, share a contract with, pay, or actually supervise those persons.[10] Accordingly, at a minimum, WDS and its employee Mr. Sand owed a duty of reasonable care to the plaintiff at all relevant times. Whether that duty was breached by the actions or omissions of Mr. Sand and whether any such breach of duty contributed to the cause of the plaintiff's accident are the issues that must be resolved in order to decide this motion.

The following facts are set forth in the deposition excerpts submitted by RCI and WDS in support of their motions for summary judgment, and they were not disputed by the plaintiff. Drilling operations and construction operations were taking place on Arena's platform at the time of the plaintiff's alleged accident. H&P was the drilling contractor, and an H&P employee operated the crane at all material times.

---

[10] *McCarroll v. Seatrax Services, Inc.*, No. 12-2402, 2013 WL 3872219, at *4 (E.D. La. July 24, 2013).

Quality Construction provided labor and equipment for the installation of piping on the platform. RCI provided Mr. Migues to ensure that Quality Construction's work met Arena's specifications. WDS provided a simultaneous operations (or "simops") coordinator to oversee the coordination of operations between the various contractors. WDS employee Gordon Sand was the simops coordinator on the platform.

At the time of the alleged incident, Quality Construction's crew included superintendent, David Franks, at least two riggers – the plaintiff Donald Batiste and Michael Comeaux – as well as several fitters and welders. That morning, Mr. Franks held a safety meeting with his crew, and Mr. Migues attended the safety meeting. After the morning safety meeting, the plaintiff went to work with Quality Construction's fitters.

At some point later in the day, someone requested that material baskets be moved from the platform to the M/V NICHOLAS C. It is not clear from the various individuals' deposition testimony precisely who originally made that request – either an H&P employee or Mr. Sand. However, it is undisputed that Mr. Sand requested that Quality Construction's riggers assist in the transfer of baskets from the platform to the vessel.

According to his deposition testimony, Mr. Batiste was an experienced rigger who had worked for Quality Construction for more than nine years and had

approximately eighteen years of total experience in that job before the date in question. (Rec. Doc. 98-6 at 4). Although he was working as a rigger on this particular job, he was sometimes designated as a rigger foreman. (Rec. Doc. 98-6 at 4). He knew how to do his job, and he took instruction on what tasks he was to perform from his supervisor, Mr. Franks. (Rec. Doc. 98-6 at 21).

The plaintiff testified at his deposition that, on the day of the alleged accident, fellow rigger Michael Comeaux came to him and told him that he was needed to go with Mr. Comeaux to meet with Mr. Franks about work to be done on the boat. (Rec. Doc. 98-6 at 7). He stated that he then met with Mr. Franks and Mr. Comeaux near the handrail of the platform's cellar deck, and that Mr. Franks told them to confer with the crane operator regarding what needed to be done. (Rec. Doc. 98-6 at 8, 9, 16). He and Mr. Comeaux then met with the crane operator, discussed what material would be transferred from the platform to the vessel, discussed who would transmit signals from the vessel to the platform, and made sure that the riggers had radio communication with the crane operator. (Rec. Doc. 98-6 at 8, 17). Mr. Comeaux was in charge of the radio used for communicating with the crane operator about positioning the baskets on the vessel's deck. (Rec. Doc. 98-6 at 8, 10, 18). Mr. Batiste and Mr. Comeaux were then transferred to the deck of the vessel by personnel basket. (Rec. Doc. 98-6 at 9). Before the backloading operation began, however, the

crane operators were changed out, and the person that the plaintiff and Mr. Comeaux had already consulted with was not the person who operated the crane during the backloading procedure. (Rec. Doc. 98-6 at 13).

Mr. Batiste testified that, as the crane was lowering the first material basket from the platform to the deck of the vessel, he realized that the basket was going to be placed on top of a pipe that was laying on the deck. (Rec. Doc. 98-6 at 10). When the basket was about eight to ten feet above the vessel's deck, he called for an "all stop" by hand signal to Mr. Comeaux. (Rec. Doc. 98-6 at 10, 19). He stated that the crane operator, the boat captain, and anyone else in the area should have been able to see his hand signal. (Rec. Doc. 98-6 at 10, 19). He could see the crane operator and he thought that the crane operator could see him. (Rec. Doc. 98-6 at 19). Mr. Batiste claims, however, that the crane operator did not stop lowering the basket, which came down on the pipe, throwing Mr. Batiste into the basket and causing him to fall to the deck. (Rec. Doc. 98-6 at 10). Mr. Batiste testified that, because he thought the crane operator had seen the "all stop" signal and was going to stop lowering the basket, he stepped forward toward the spot where the basket was being set down, but the crane operator did not stop lowering the basket, and the basket struck the pipe, which "catapults me into the load itself." (Rec. Doc. 98-6 at 19).

Mr. Comeaux's testimony is generally consistent with Mr. Batiste's testimony. He understood that three material baskets were to be backloaded from the platform to the vessel, and the incident occurred while the first basket was being lowered. (Rec. Doc. 98-7 at 6). Mr. Comeaux testified that the riggers did not need Mr. Sand to tell them how to backload baskets from the platform to the boat (Rec. Doc. 100-6 at 4), and he explained that the final decision on how the baskets would be positioned on the vessel's deck was left to the riggers. (Rec. Doc. 98-7 at 6). Mr. Comeaux's testimony differed from Mr. Batiste's in that Mr. Comeaux thought Mr. Sand was present for the JSA at the handrail. (Rec. Doc. 98-7 at 3). He additionally stated that Mr. Franks told him that it was Mr. Sand who had requested that the riggers help with backloading the boat. (Rec. Doc. 98-7 at 2). But Mr. Comeaux stated that Mr. Sand did not give the riggers any detailed instructions about how they were to move the baskets from the platform to the boat; he just wanted them to do it safely. (Rec. Doc. 100-6 at 3). He also stated that Mr. Franks explained the procedure for the operation and presented he and Mr. Batiste with a JSA [job safety analysis] that they signed before going over to the boat. (Rec. Doc. 98-6 at 2, 7).

Like Mr. Batiste, Mr. Comeaux testified that the crane operator that he and Mr. Batiste conferred with before being transferred to the vessel was not the crane operator who actually moved the material basket from the platform to the vessel.

(Rec. Doc. 98-7 at 3, 6). Before the operation began, however, Mr. Comeaux confirmed with the new crane operator that they had radio communication. (Rec. Doc. 98-7 at 8). Before the crane operator started lowering the basket, Mr. Comeaux observed pipes laying on the deck between some of the material baskets but he did not think that would affect the placement of the baskets that were being backloaded. (Rec. Doc. 98-7 at 6, 8). However, as the basket was being lowered, he heard Mr. Batiste call out an oral "all stop" command, and Mr. Comeaux radioed an "all stop" instruction to the crane operator; then Mr. Comeaux also saw Mr. Batiste giving the "all stop" hand signal. (Rec. Doc. 98-7 at 4, 6). But the crane operator did not stop lowering the basket. (Rec. Doc. 98-7 at 4). Mr. Comeaux testified that the basket came down on a pipe on the vessel's deck, which hit Mr. Batiste, causing his hard hat to fly off. (Rec. Doc. 98-7 at 4, 5). Mr. Comeaux believed that the crane operator had a clear line of sight to both he and Mr. Batiste, and he told the crane operator to "all stop" over the radio three or four times, but the crane operator did not stop. (Rec. Doc. 98-7 at 4, 5).

Benny Withers, an H&P employee, was operating the crane at the time of the incident. (Rec. Doc. 98-8 at 2). He worked the night shift, which was from 6:00 p.m. to 6:00 a.m. (Rec. Doc. 98-8 at 2). He testified that he had a meeting at the pipe rack with someone who might have been Mr. Sand concerning how baskets on the vessel

were to be repositioned so that baskets from the platform could be backloaded onto the vessel, and that he then communicated that same information via radio to men on the deck of the vessel. (Rec. Doc. 98-8 at 3-4, 10, 14-15). He testified that he maintained a line of sight on Mr. Batiste during the operation (Rec. Doc. 98-8 at 5-6) but never saw an "all stop" signal (Rec. Doc. 98-8 at 8). He also stated that he never received a radio message telling him to stop. (Rec. Doc. 98-8 at 8-9). He testified that, other than the person he conferred with at the pipe rack, nobody else gave him any instructions on how to perform this job. (Rec. Doc. 98-8 at 14). He stated that he had a verbal JSA before the operation began with one other person but he does not recall whether that person was Mr. Sand, the vessel's captain, or someone else. (Rec. Doc. 98-8 at 10-11). During that JSA meeting, he and whoever he was meeting with collaboratively decided how to arrange the baskets on the vessel's deck. (Rec. Doc. 98-8 at 12-15). Mr. Withers also stated that, as the crane operator, he had the responsibility to override a signal given by the riggers if doing so would avoid an unsafe condition or if the signal was incorrect given the circumstances. (Rec. Doc. 98-8 at 10). Further, he stated that he did not need anyone to give him step-by-step instructions on how to move the baskets. (Rec. Doc. 98-8 at 15).

At his deposition, Mr. Franks stated that he supervised approximately sixteen people on Quality Construction's crew and gave them their day-to-day work

assignments. (Rec. Doc. 98-4 at 2). He said that Mr. Sand was the simops coordinator between the construction work and the drilling work on the platform. (Rec. Doc. 98-4 at 2-3). Mr. Franks stated that Mr. Sand was not a supervisor over his crew or a supervisor over H&P's crane operators. (Rec. Doc. 100-4 at 3). Mr. Franks testified that, on the day of the accident, Mr. Sand asked him to provide riggers so that equipment could be backloaded onto the vessel. (Rec. Doc. 98-4 at 5). He stated that H&P personnel always operated the crane, that numerous transfers between the platform and vessels occurred every day, and that it was typical for Quality Construction's personnel to meet with the crane operator and discuss a task before it was undertaken. (Rec. Doc. 98-4 at 3-4). Mr. Franks recalled that such a meeting including himself, Mr. Comeaux, Mr. Batiste, and the crane operator took place before the incident in question. (Rec. Doc. 98-4 at 4, 8). Mr. Franks testified that, on this occasion, he, Mr. Comeaux, Mr. Batiste, and the day shift crane operator stood at the rail, looked down at the boat, and discussed what was going to be done. (Rec. Doc. 98-4 at 8). After the meeting, he went into his office, prepared a JSA, then came back out and rejoined Mr. Batiste and Mr. Comeaux. (Rec. Doc. 98-4 at 4, 9). Mr. Franks then had a further meeting with the crane operator, Mr. Batiste, and Mr. Comeaux. (Rec. Doc. 98-4 at 9). During these meetings, Mr. Franks identified what had to be moved to make room for the baskets that were being backloaded but he

stated that how the objects were moved was up to the crane operator and the riggers once they were on the boat. (Rec. Doc. 98-4 at 9).

After the meetings, Mr. Franks went back to his office, and he did not witness the incident. Instead, an unidentified safety man came into the office, advised he and Mr. Migues that an incident had occurred, and he and Mr. Migues then met Mr. Sand coming into the office as they were leaving the office. (Rec. Doc. 98-4 at 4). Mr. Franks's recollection was that, after Mr. Sand asked him to provide the riggers to assist with moving the baskets, he went to the rail, wrote up a JSA, met with Mr. Comeaux and Mr. Batiste, then Mr. Comeaux and Mr. Batiste went upstairs to the crane, and Mr. Franks went back into the office. (Rec. Doc. 98-4 at 8-9).

Arena employee Donald McCallum testified at his deposition that Mr. Sand's job was to make sure that any overlapping activities of the drilling, production, and construction crews "do not cause a problem." (Rec. Doc. 100-2 at 3). However, he also stated that Mr. Sand did not have the authority to direct work of any kind. (Rec. Doc. 100-2 at 4). Mr. Sand could tell the drilling side that the crane was needed by the construction side, but he had no authority or responsibility regarding the particulars of how the crane would be used. (Rec. Doc. 100-2 at 4).

Mr. Sand testified at his deposition that he was employed by WDS and working as Arena's simops coordinator on the platform at the time of the alleged incident,

coordinating drilling and construction operations. (Rec. Doc. 98-5 at 3). He stated that he had no safety or compliance duties. (Rec. Doc. 100-3 at 2). As the simops coordinator, Mr. Sand coordinated the needs of the construction people to use the drilling side's equipment to move their stuff around. (Rec. Doc. 100-3 at 4). However, he had no authority over the personnel on the drilling side or on the construction side. (Rec. Doc. 100-3 at 4-5). No one reported to him. (Rec. Doc. 100-3 at 5). He did not give instructions to anyone on the drilling side or on the construction side on how to perform their jobs. (Rec. Doc. 100-3 at 5).

Mr. Sand's recollection was that the construction crew contacted him to coordinate the use of the crane to transfer empty containers from the platform to the vessel and bring full containers from the vessel to the platform. (Rec. Doc. 98-3 at 4). He testified that he and someone from the construction company – perhaps Mr. Migues – looked at the baskets that needed to be moved to the boat and discussed how they could be arranged on the boat. (Rec. Doc. 98-5 at 6). He did not know how that person would have communicated what they discussed to anyone else, and he stated that he had no further involvement in the layout of the baskets or how they were to be placed on the vessel. (Rec. Doc. 98-5 at 6). Mr. Sand further testified that, at shift change that evening, he met with the crane operator who was going on tower, stood at the handrail, and discussed what he thought was going to happen.

(Rec. Doc. 98-5 at 7). He pointed out the baskets that he thought were going to be moved. (Rec. Doc. 98-5 at 12). Mr. Sand knew that a pipe was laying on the vessel's deck, stated that the pipe was in the only place that it could fit on the deck, and further stated that he did not think a material basket would be placed near the pipe during the backloading operation. (Rec. Doc. 98-5 at 11). But he did not know what instructions were given to the riggers with regard to positioning the baskets on the vessel's deck. (Rec. Doc. 98-5 at 12-13, 15). At the time of the accident, Mr. Sand was standing on the platform, alone, looking over the handrail down at the boat. (Rec. Doc. 98-5 at 5-6). Mr. Sand was under the impression that baskets on the deck of the vessel would be moved and repositioned before baskets were lowered from the platform to the vessel, but that did not occur. (Rec. Doc. 100-3 at 9-10, 13). In fact, before the operation began, he pointed out to the crane operator the baskets that he thought would be moved. (Rec. Doc. 100-3 at 11). Instead, however, an empty basket was lowered by the crane operator before any repositioning on the vessel's deck took place. (Rec. Doc. 100-3 at 10). Although he was not certain because he was on the platform rather than the vessel, Mr. Sand thought there was sufficient room on the vessel's deck for the basket that was being lowered. (Rec. Doc. 100-3 at 10, 14). He could see the pipe on the vessel's deck but still thought there was sufficient room for the basket to be set down. (Rec. Doc. 100-3 at 10).

According to Mr. Migues, Mr. Sand's role as simops coordinator included obtaining the use of the crane by the construction crew when necessary. (Rec. Doc. 98-3 at 4). Mr. Migues did not know if Mr. Sand's role included supervising the crane operators. (Rec. Doc. 100-5 at 5). His recollection was that, on the day of the incident, an H&P employee went to Mr. Sand and advised that some baskets needed to be moved from the platform to the boat, and Mr. Sand then went to Mr. Franks and asked him to provide riggers on the boat to assist with that operation. (Rec. Doc. 98-3 at 5). Mr. Migues described such transfers as "routine stuff." (Rec. Doc. 98-3 at 7). Mr. Migues did not see the incident happen, and he learned about it after it occurred. (Rec. Doc. 98-3 at 7). In fact, his testimony was that nobody communicated with him about repositioning the material baskets until after it had already taken place. (Rec. Doc. 98-3 at 10, 11).

There is no evidence that Mr. Sand gave Mr. Batiste or Mr. Comeaux any instructions on where to position the material baskets backloaded from the platform onto the deck of the vessel or how they were to go about performing that task. Mr. Sand testified that he had a conversation with the night shift crane operator – Mr. Withers – before he went on duty and pointed out the baskets that he thought were going to be moved. Consistently, Mr. Withers testified that he met with someone before the operation began and discussed how the baskets on the vessel's deck should

be repositioned. But there is no evidence that Mr. Sand instructed Mr. Withers on how to perform the backloading operation. Moreover, Mr. Sand testified that what he thought was going to occur was not what actually happened because no baskets already on the vessel were rearranged before an empty basket was lowered from the platform to the vessel. Therefore, if Mr. Sand did give instructions to Mr. Withers, those instructions were disregarded. There is no evidence that Mr. Sand gave Mr. Batiste, Mr. Comeaux, or Mr. Withers any instructions on how they were to communicate with each other, signal each other, or otherwise perform the task of backloading the baskets. Even if Mr. Migues did discuss with Mr. Sand which baskets were to be moved off the platform and where they were to then be placed on the vessel – as Mr. Sand contended but as was disputed by Mr. Migues's testimony – it is undisputed that the riggers had the final say with regard to where and how the baskets were to be positioned on the vessel's deck. Mr. Sand's role was to be the liaison between the drilling contractors and the construction contractors but he had no supervisory duties and no authority to tell any of the workers on the platform how to do their jobs.

Therefore, WDS successfully established that there is no genuine issue of material fact concerning whether Mr. Sand or WDS breached any duty it may have owed to the plaintiff; consequently, WDS is entitled to judgment in its favor as a

matter of law. Similarly, WDS successfully established that there is no genuine issue of material fact concerning whether any action or omission on Mr. Sand's part caused the alleged incident or the plaintiff's allegedly resulting injuries. For that additional reason, WDS is entitled to judgment in its favor as a matter of law.

## Conclusion

For the foregoing reasons, and finding no genuine issue of material fact to be resolved, this Court finds that there is no evidence that defendant WDS Global Partners, LLC is liable for the plaintiff's alleged accident and resulting injuries. Accordingly, WDS's motion for summary judgment (Rec. Doc. 100) is GRANTED, and the plaintiff's claim against WDS is DISMISSED WITH PREJUDICE.

Signed at Lafayette, Louisiana on this 7th day of March 2018.

_____
PATRICK J. HANNA
UNITED STATES MAGISTRATE JUDGE