UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF LOUISIANA
LAFAYETTE DIVISION

| | |
|---|---|
| DONALD BATISTE | CIVIL ACTION NO. 6:14-cv-03045 |
| VERSUS | MAGISTRATE JUDGE HANNA |
| QUALITY CONSTRUCTION & PRODUCTION LLC, ET AL. | BY CONSENT OF THE PARTIES |

## **MEMORANDUM RULING**

Pending before this Court is the motion for summary judgment that was filed by defendant Helmerich & Payne International Drilling Co. ("H&P"). (Rec. Doc. 105). The motion is opposed. Considering the evidence, the law, and the arguments of the parties, and for the reasons fully explained below, the motion is DENIED.

## **Background**

In October 2013, the plaintiff, Donald Batiste, was employed by defendant Quality Construction and Production, LLC as a rigger. He and his crew were working on a construction project on an offshore platform in the Gulf of Mexico that was owned and operated by defendant Arena Energy, LP. H&P was conducting drilling operations on the platform pursuant to a separate contract with Arena. There is no dispute that H&P and Quality Construction were Arena's independent contractors. H&P contracted with Arena to provide a drilling rig and necessary personnel including crane operator Benny Withers. (Rec. Doc. 105-9). Quality Construction

contracted with Arena to provide labor and materials for construction services on Arena's platform including Donald Batiste. (Rec. Doc. 105-5).

The plaintiff contends that his accident and resulting injuries were caused by the negligence of H&P's crane operator. Specifically, the plaintiff claims that he was injured on October 26, 2013 while standing on the deck of a vessel engaged in the task of backloading the vessel from the platform. He contends that he gave an "all stop" signal that was ignored by the H&P crane operator and that the crane operator proceeded to set a material basket down on a pipe that was laying on the vessel's deck. In his complaint, the plaintiff alleged that he was injured when the basket's contact with the pipe caused him to be flung into the side of the basket and also caused the pipe to rise up into the air and strike him in the head.

The plaintiff asserted negligence claims against several defendants, including H&P. In support of its motion, H&P argued that it is entitled to summary judgment in its favor because it neither owed a duty to the plaintiff nor breached any duty that it might have owed.

## Analysis

### A. The Summary Judgment Standard

Under Rule 56(a) of the Federal Rules of Civil Procedure, summary judgment is appropriate when there is no genuine dispute as to any material fact, and the

moving party is entitled to judgment as a matter of law. A fact is material if proof of its existence or nonexistence might affect the outcome of the lawsuit under the applicable governing law.[1] A genuine issue of material fact exists if a reasonable jury could render a verdict for the nonmoving party.[2]

The party seeking summary judgment has the initial responsibility of informing the court of the basis for its motion and identifying those parts of the record that demonstrate the absence of genuine issues of material fact.[3] If the moving party carries its initial burden, the burden shifts to the nonmoving party to demonstrate the existence of a genuine issue of a material fact.[4] All facts and inferences are construed in the light most favorable to the nonmoving party.[5]

If the dispositive issue is one on which the nonmoving party will bear the burden of proof at trial, the moving party may satisfy its burden by pointing out that

---

[1] *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Sossamon v. Lone Star State of Tex.*, 560 F.3d 316, 326 (5th Cir. 2009); *Hamilton v. Segue Software, Inc.*, 232 F.3d 473, 477 (5th Cir. 2000).

[2] *Brumfield v. Hollins*, 551 F.3d 322, 326 (5th Cir. 2008) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. at 252); *Hamilton v. Segue Software, Inc.*, 232 F.3d at 477.

[3] *Washburn v. Harvey*, 504 F.3d 505, 508 (5th Cir. 2007) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)).

[4] *Washburn v. Harvey*, 504 F.3d at 508.

[5] *Brumfield v. Hollins*, 551 F.3d at 326 (citing *Matsushita Elec. Indus. Co. v. Zenith Radio*, 475 U.S. 574, 587 (1986)).

there is insufficient proof concerning an essential element of the nonmoving party's claim.[6] The motion should be granted if the nonmoving party cannot produce evidence to support an essential element of its claim.[7]

**B.    The Basis for Subject Matter Jurisdiction is a Threshold Issue**

In his 26(f) report, the plaintiff sets forth that jurisdiction is premised on federal question jurisdiction, presumably, the Outer Continental Shelf Lands Act (43 U.S.C. §1331). In his briefing, plaintiff contends the claims against H&P are governed by the general maritime law because the plaintiff was on a vessel in navigable waters at the time of the accident. H&P seems to contend in the 26(f) report that the claims against it are governed by Louisiana state law pursuant to the OCSLA.

The plaintiff alleged in his complaint that the accident occurred near Eugene Island in the Gulf of Mexico. The 26(f) report identifies the block as EI-314C which is on the OCS and adjacent to the shores of Louisiana. Because the OCSLA would adopt Louisiana state law as surrogate federal law, the choice of law question is whether the plaintiff's claim against H&P in its capacity as the employer of the crane

---

[6] *Norwegian Bulk Transport A/S v. International Marine Terminals Partnership*, 520 F.3d 409, 412 (5th Cir. 2008) (citing *Celotex Corp. v. Catrett*, 477 U.S. at 325).

[7] *Condrey v. Suntrust Bank of Ga.*, 431 F.3d 191, 197 (5th Cir. 2005).

operator is governed by Louisiana substantive law or the general maritime law. That inquiry necessarily requires a look at subject matter jurisdiction.

*1. OCSLA Jurisdiction Over Claims Against H&P*

The Fifth Circuit has explained the scope of OCSLA jurisdiction as follows:

> The jurisdictional grant, contained in 43 U.S.C. §1349(b)(1), is very broad. With exceptions not relevant here, the statute provides that "the district courts of the United States shall have jurisdiction of cases and controversies *arising out of, or in connection with* (A) any *operation* conducted on the outer Continental Shelf which involves *exploration, development, or production* of the minerals, of the subsoil and seabed of the outer Continental Shelf, or which involves rights to such minerals, or (B) the cancellation, suspension, or termination of a lease or permit under this subchapter.

*Tennessee Gas Pipeline v. Houston Casualty, Co.*, 87 F.3d 150, 154 (5th Cir. 1996).

The Fifth Circuit uses a "but for" test to determine whether OCSLA provides a basis for federal court jurisdiction. *Simms v. Roclan Energy Services, Inc.*, 137 F.Supp.2d 73, 734 (W.D.La. 2001), citing *Tennessee Gas*, 87 F.3d at 155. "A plaintiff's claims arise under OCSLA if 1) plaintiff's employment furthered mineral development on the Outer Continental Shelf, and 2) plaintiff's injury would not have occurred "but for" his employment." *Simms*, 137 F.Supp. 2d at 734, citing *Recar v. CNG Producing Co.*, 853 F.2d 367, 369 (5th Cir. 1988).

In the original complaint the plaintiff alleged that he was a seaman and was injured on a vessel while backloading cargo being transferred from the platform via a platform crane to the vessel. However, it is now undisputed plaintiff was employed as a rigger on the platform. His employment as a rigger, including the incidental loading or unloading of cargo to and from OCS platforms, furthered mineral development on the OCS, and therefore, falls into OCSLA's broad jurisdictional grant. In addition, but for his employment as a rigger who was tasked with assisting the vessel crew in loading cargo from the platform onto the vessel, the injury would not have occurred. Therefore, the Court finds plaintiff's claims against H&P fall under OCSLA's jurisdictional grant.

*2. Admiralty Jurisdiction Over Claims Against H&P*

Admiralty jurisdiction is determined by a two part test of (1) location and (2) connection with maritime activity. *Sisson v. Ruby*, 497 U.S. 358, 363 (1990). "For jurisdictional purposes, 'a tort occurs where the impact of the act or omission produces injury.'" *Hails v. Atlantic Richfield Co.*, 595 F.Supp. 948, 950 (D.C. La. 1984), citing *Avondale Shipyards, Inc. v. Vessel Thomas E. Cuffe*, 434 F.Supp. 920, 927 (E.D.La.1977). Thus, the Court finds the location test is met in this case. While any negligence by H&P may have occurred on the platform by the crane operator's alleged negligent operation of the crane, the effect of the alleged negligence, injuries

to the plaintiff, occurred on a vessel in navigable water. However, that does not end the analysis.

The connection test is met when (1) the type of incident involved has the potential to disrupt maritime commerce and (2) "the general character of the activity giving rise to the incident shows a substantial relationship to traditional maritime activity." *Grubart v. Great Lakes Dredge & Dock Co.*, , 513 U.S. 527, 534 (1995).

In *Scarborough v. Clemco Industries*, 391 F.3d 660, 665 (5th Cir. 2004), the court found sandblasting activity, when framed as an "injury to a Jones Act seaman due to the negligence of a non-employer," had the potential to disrupt maritime commerce. In *Hall v. Environmental Chemical Corp.*, 64 F.Supp.2d 638, 640 (S.D.Tex. 1999), the court found injury to a Jones Act seaman who operated a crane upon a barge on navigable waters one that "has a potentially disruptive impact on maritime commerce in that it could delay the transfer of goods, material, and cargo to and from the barge."

However, the Court finds that even though Mr. Batiste was injured on the deck of vessel performing the traditional maritime activity of loading cargo, the undisputed fact is he was a platform worker whose job functions were primarily to assist in platform-related work. Therefore the narrow question is, given that the plaintiff's presence was somewhat fortuitous aboard the vessel and his primary connection was

to the platform, whether this type of incident has the potential to disrupt maritime commerce. This Court finds that it does not.

Unlike other decisions where the injured party is a member of the crew of the vessel, Mr. Batiste was not. In no way minimizing the alleged impact to Mr. Batiste, the Court concludes that an injury to a platform worker, who is injured by the alleged negligence of another platform worker, even though performing traditional maritime activity, is not the sort of incident that would affect maritime commerce. Therefore, the Court finds, under the tests of *Sisson* and *Grubart*, the Court does not have admiralty jurisdiction over the claims made by plaintiff against H&P. Moreover, even assuming the presence of admiralty jurisdiction, that would not necessarily negate the applicability of OCSLA jurisdiction. *Tennessee Gas*, 87 F.3d at 155, referencing *Recar*, 853 F.2d at 369.

**C.  The Applicable Substantive Law**

Even assuming both OCSLA and admiralty provide bases of jurisdiction, the Court must determine the applicable substantive law. A review of the jurisprudence shows neither jurisdictional determination *definitively* determines applicable substantive law. In *Grubart*, 513 U.S. at 546, the Supreme Court found land-based defendants were subject to the court's admiralty jurisdiction, but clarified that

admiralty jurisdiction, itself, did not necessarily prohibit the application, in some instances, of state law:

> As noted just above, Congress has already made the judgment, in the Extension Act, that a land-based victim may properly be subject to admiralty jurisdiction. Surely a land-based joint tortfeasor has no claim to supposedly more favorable treatment. . . Contrary to what the city suggests. . . exercise of federal admiralty jurisdiction does not result in automatic displacement of state law. It is true that, "[w]ith admiralty jurisdiction comes the application of substantive admiralty law." *East River S.S. Corp. v. Transamerica Delaval Inc.*, 476 U.S. 858, 864, 106 S.Ct. 2295, 2298-2299, 90 L.Ed.2d 865 (1986). . . See *East River*, supra, at 864-865, 106 S.Ct., at 2298-2299 ("Drawn from state and federal sources, the general maritime law is an amalgam of traditional common-law rules, modifications of those rules, and newly created rules" (footnote omitted)). Thus, the city's proposal to synchronize the jurisdictional enquiry with the test for determining the applicable substantive law would discard a fundamental feature of admiralty law, that federal admiralty courts sometimes do apply state law. See, e.g., *American Dredging Co. v. Miller*, 510 U.S. 443, 451-452, 114 S.Ct. 981, 987, 127 L.Ed.2d 285 (1994); see also 1 S. Friedell, Benedict on Admiralty § 112, p. 7-49 (7th ed. 1994).

Likewise, a determination that OCSLA jurisdiction exists does not necessarily mandate the application of the adjacent state's law, in this case Louisiana. OCSLA provides its own "choice of law" rules, as follows:

> (2)(A) To the extent that they are applicable and not inconsistent with this subchapter or with other Federal laws and regulations of the Secretary now in effect or hereafter adopted, the civil and criminal laws of each adjacent State, now in effect or hereafter adopted, amended, or repealed are declared to be the law of the United States for that portion of the subsoil and seabed of the outer Continental Shelf, and artificial islands and fixed structures erected thereon, which would be within the

area of the State if its boundaries were extended seaward to the outer margin of the outer Continental Shelf, and the President shall determine and publish in the Federal Register such projected lines extending seaward and defining each such area. All of such applicable laws shall be administered and enforced by the appropriate officers and courts of the United States. State taxation laws shall not apply to the outer Continental Shelf.

43 U.S.C. § 1333(a)(2)(A)

The Fifth Circuit has clarified that for Louisiana law to apply as "surrogate federal law under OCSLA, three conditions are significant. (1) The controversy must arise on a situs covered by OCSLA (i.e. the subsoil, seabed, or artificial structures permanently or temporarily attached thereto). (2) Federal maritime law must not apply of its own force. (3) The state law must not be inconsistent with Federal law." *Union Texas Petroleum Corp. v. PLT Engineering, Inc.*, 895 F.2d 1043, 1047 (5th Cir. 1990).

Due to OCSLA's broad jurisdictional grant, the first condition is met, even though the actual injury did not occur on the platform, because the "controversy", i.e. whether the crane operator on the platform was negligent, did occur on a covered situs. The third condition is met, as the standards for whether a legal duty is owed to an individual such as the plaintiff, and the breach thereof, are essentially identical under maritime and Louisiana law. Therefore, Louisiana law would be applicable as

surrogate federal law to the claim against H&P unless federal maritime law is applicable by its own force.

In *Texaco Exploration and Production, Inc. v. AmClyde Engineered Products Co., Inc.*, 448 F.3d 760, 774 (5th Cir. 2006), the court evaluated whether maritime law applied "by its own force" to an OCSLA jurisdiction case, found it did not, reasoning "[m]aritime law cannot apply of its own force because there is an insufficient connection between the underlying torts and traditional maritime activity."

However, in *Strong v. B.P. Exploration & Production, Inc.*, 440 F.3d 665, 670 (5th Cir. 2006), the court expressly linked a maritime tort with the application of federal maritime law by its own force in an OCSLA case: "[b]ecause Strong has alleged a traditional maritime tort, federal maritime law applies of its own force, precluding incorporation of state law under OCSLA and prescribing Strong's claim." In determining whether Strong had pled a maritime tort, the court used the test for admiralty jurisdiction in *Grubart*.

In this case, a platform based employee, was injured on a vessel in navigable waters, while handling cargo loaded from a platform, by a platform crane, onto the deck of the vessel. As previously indicated, while there is a connection between the tort alleged and a traditional maritime activity, loading a vessel, based on the jurisdictional analysis under *Grubart* there is no indication that the incident, as made

applicable to H&P, would sufficiently affect maritime commerce so as to find maritime law applicable by its own force. To find to the contrary would essentially negate the applicability of OCSLA mandated choice of law in every transaction involving a crane and loading operations aboard a vessel regardless of the claims at issue.

**D.    Genuine Issues of Material Fact Preclude Summary Judgment in H&P's Favor**

Under Louisiana law, an independent contractor such as H&P does not owe a special duty to the employees of the other independent contractors on the job but does owe a duty of reasonable care.[8] However, a crane operator owes a duty to operate the crane in the manner of a reasonably prudent crane operator.[9] More particularly, a crane operator owes a duty of reasonable care to communicate with the persons he is working with when transferring loads to a vessel, especially when he is working with persons he has not previously worked with.[10]

It is undisputed that, at the time of the alleged accident, two Quality Construction employees, riggers Michael Comeaux and Donald Batiste, had been

---

[8] *McCarroll v. Seatrax Services, Inc.*, No. 12-2402, 2013 WL 3872219, at *4 (E.D. La. July 24, 2013).

[9] *Ramsey v. Georgia-Pacific Corp.*, 511 F.Supp. 393, 401 (S.D. Miss. 1981).

[10] *Derouen v. Hercules Liftboat Co., LLC*, 141 F.Supp.3d 662, 669 (E.D. La. 2015)

lowered from the platform to the deck of the M/V NICHOLAS C so that they could assist with the backloading of material baskets from the platform to the vessel. It is equally undisputed that H&P employee Benny Withers was operating the crane at all relevant times.

The plaintiff was an experienced rigger who had worked for Quality Construction for more than nine years and had approximately eighteen years of total experience in that job before the incident. (Rec. Docs. 105-6 at 10, 105-8 at 4). Although he was working as a rigger on this particular job, he was sometimes designated as a rigger foreman. (Rec. Doc. 105-8 at 4). He knew how to do his job. (Rec. Doc. 98-6 at 21).

The plaintiff testified in deposition[11] that, on the day of the alleged accident, fellow rigger Michael Comeaux came to him and told him that he was needed to go with Mr. Comeaux to meet with Mr. Franks, the Quality Construction crew superintendent, about work to be done on the boat. (Rec. Doc. 98-6 at 7; Rec. Doc. 120-7 at 45, 95). He stated that he then met with Mr. Franks and Mr. Comeaux near

---

[11] The plaintiff was deposed twice, on August 13, 2015 and again on May 16, 2017. In support of this motion, H&P submitted portions of both depositions. Notably, however, H&P did not submit all of the excerpts from the 2015 deposition that were placed in the record by defendant RCI Consultants, Inc. in support of its motion for summary judgment (Rec. Doc. 98). In opposition to this motion, the plaintiff submitted the entire 2015 deposition into the record but none of the 2017 deposition. This Court finds some of the 2015 deposition testimony that was not placed in the record with regard to this motion to be germane and cites it here by referencing Rec. Doc. 98-6.

the handrail of the platform's cellar deck, and that Mr. Franks told them to confer with the crane operator regarding what needed to be done. (Rec. Doc. 98-6 at 8, 9, 16; Rec. Doc. 120-7 at 96). He and Mr. Comeaux then met with the day shift crane operator, discussed what material would be transferred from the platform to the vessel, discussed who would transmit signals from the vessel to the platform, and made sure that the riggers had radio communication with the crane operator. (Rec. Doc. 98-6 at 8, 17; Rec. Doc. 120-7 at 98-99). Mr. Comeaux was in charge of the radio, which was going to be used for communicating with the crane operator about positioning the baskets on the vessel's deck. (Rec. Doc. 98-6 at 8, 10, 18; Rec. Doc. 120-7 at 47, 97). Mr. Batiste and Mr. Comeaux were then transferred to the deck of the vessel by personnel basket. (Rec. Doc. 98-6 at 9; Rec. Doc. 120-7 at 46). Before the backloading operation began, however, the crane operators were changed out, and the person that the plaintiff and Mr. Comeaux had already consulted with was not the person who operated the crane during the backloading procedure. (Rec. Doc. 98-6 at 13; Rec. Doc. 120-7 at 71-72).

Mr. Batiste testified that he realized, as the crane was lowering the first material basket from the platform to the deck of the vessel,[12] that the basket was going

---

[12] Mr. Withers contends, to the contrary, that the basket being moved was being relocated on the deck of the vessel and had not been lowered from the platform to the vessel. (Rec. Doc. 120-4 at 27).

to be placed on top of a pipe that was laying on the deck. (Rec. Doc. 105-6 at 4; Rec. Doc. 120-7 at 48). When the basket was about eight to ten feet above the vessel's deck, he called for an "all stop" by hand signal to Mr. Comeaux. (Rec. Doc. 105-6 at 4, 5, 13-14; Rec. Doc. 105-8 at 7-8; Rec. Doc. 120-7 at 48, 73, 105-106, 113-114). He stated that the crane operator, the boat captain, and anyone else in the area should have been able to see his hand signal. (Rec. Doc. 98-6 at 10, 19). He could see the crane operator, and he thought that the crane operator could see him. (Rec. Doc. 98-6 at 19). Mr. Batiste claims, however, that the crane operator did not stop lowering the basket, which came down on the pipe, throwing Mr. Batiste into the basket and causing him to fall to the deck. (Rec. Doc. 105-6 at 8; Rec. Doc. 120-7 at 57-60, 76). More particularly, Mr. Batiste testified that, because he thought the crane operator had seen the "all stop" signal and was going to stop lowering the basket, he stepped forward toward the spot where the basket was being set down, but the crane operator did not stop lowering the basket, and the basket struck the pipe, which "catapults me into the load itself." (Rec. Doc. 98-6 at 19).

Mr. Comeaux's testimony regarding the incident is generally consistent with Mr. Batiste's testimony. He understood that three material baskets were to be backloaded from the platform to the vessel, and the incident occurred while the first basket was being lowered. (Rec. Doc. 105-14 at 3; Rec. Doc. 120-5 at 46, 47). Mr.

Comeaux testified that the final decision on how the baskets would be positioned on the vessel's deck was left to the riggers. (Rec. Doc. 105-14 at 3; Rec. Doc. 120-5 at 47).

Like Mr. Batiste, Mr. Comeaux testified that the crane operator that he and Mr. Batiste conferred with before being transferred to the vessel was not the crane operator who actually moved the material basket from the platform to the vessel. (Rec. Doc. 120-5 at 14, 46). Before the operation began, however, Mr. Comeaux confirmed with the new crane operator that they had radio communication. (Rec. Doc. 105-14 at 4-5; Rec. Doc. 120-5 at 81, 82). Before the crane operator started lowering the basket, Mr. Comeaux observed pipes lying on the deck between some of the material baskets but he did not think that would affect the placement of the baskets that were being backloaded. (Rec. Doc. 105-14 at 5; Rec. Doc. 120-5 at 47, 82). However, as the basket was being lowered, he heard Mr. Batiste call out an oral "all stop" command, and Mr. Comeaux radioed an "all stop" instruction to the crane operator; then Mr. Comeaux also saw Mr. Batiste giving the "all stop" hand signal. (Rec. Doc. 120-5 at 21-24, 28). But the crane operator did not stop lowering the basket. (Rec. Doc. 120-5 at 22, 24). Mr. Comeaux testified that the basket came down on a pipe on the vessel's deck, which hit Mr. Batiste, causing his hard hat to fly off. (Rec. Doc. 120-5 at 22, 27). Mr. Comeaux believed that the crane operator had

a clear line of sight to both he and Mr. Batiste, and he told the crane operator to "all stop" over the radio three or four times, but the crane operator did not stop. (Rec. Doc. 120-5 at 25).

H&P employee Benny Withers was operating the crane at the time of the incident. (Rec. Doc. 120-4 at 20). He testified that he had a meeting at the pipe rack with someone who might have been Gordon Sand, the SIMOPS coordinator, concerning how baskets on the vessel were to be repositioned so that baskets from the platform could be backloaded onto the vessel, and that he then communicated that same information via radio to men on the deck of the vessel. (Rec. Doc. 105-15 at 2; Rec. Doc. 120-4 at 28-29). He testified that he maintained a line of sight on Mr. Batiste during the operation (Rec. Doc. 105-15 at 7; Rec. Doc. 120-4 at 53) but never saw an "all stop" signal (Rec. Doc. 105-15 at 7, 14, 16; Rec. Doc. 120-4 at 53, 66, 117). He also stated that he never received a radio message telling him to stop. (Rec. Doc. 105-15 at 13-14; Rec. Doc. 120-4 at 65-66, 117).

The riggers testified that the "all stop" command was given orally and also by hand signal. The crane operator testified that he never saw or heard those signals. "In determining whether a case presents triable issues of fact," the court "may not make credibility determinations or weigh the evidence" and "must resolve all

ambiguities and draw all permissible inferences in favor of the non-moving party."[13] Accordingly, the conflicting testimony regarding the "all stop" command creates a genuine issue of material fact as to whether the duty owed to the plaintiff by the crane operator was breached thereby precluding summary judgment in H&P's favor.

## Conclusion

Having found that a genuine issue of material fact exists,

IT IS ORDERED that H&P's motion for summary judgment (Rec. Doc. 105) is DENIED.

Signed at Lafayette, Louisiana on this 26th day of March 2018.

_____
PATRICK J. HANNA
UNITED STATES MAGISTRATE JUDGE

---

[13] *Total E & P USA Inc. v. Kerr–McGee Oil and Gas Corp.*, 719 F.3d 424, 434 (5th Cir. 2013).